UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JONATHAN SPALLETTA,<br><br>Defendant. | 26-cr-118 (JSR)<br><br>Opinion |

JED S. RAKOFF, U.S.D.J.

On July 29, 2026, this Court issued a "bottom-line" Order denying Defendant Jonathan Spalletta's motion to dismiss the Indictment. See ECF No. 17. This Opinion sets forth the reasons for that Order.

## I. Background

The two-count Indictment returned in this case charges Spalletta with a violation of the Computer Fraud and Abuse Act ("CFAA") and with money laundering. See ECF No. 2 ("Indictment"). On two separate occasions, Spalletta targeted Uranium Finance ("Uranium"), a decentralized cryptocurrency exchange, and extracted more than $50 million from the platform. See id. ¶ 1. These two attacks caused severe damage to Uranium, in alleged violation of the CFAA (Count One). Spalletta's subsequent efforts

to conceal his attacks form the basis for the money laundering charge (Count Two).

Uranium, the Indictment alleges, is a so-called decentralized exchange that facilitated the sale of cryptocurrency without interposing a third-party intermediary between its users. Id. ¶ 3. To do this, Uranium controlled liquidity pools of particular cryptocurrencies and used "smart contracts" — a type of "computer program that runs on a blockchain" — to act as an "automated market maker" for buyers and sellers of those currencies. Id. Individual users would deposit cryptocurrencies into Uranium liquidity pools, and Uranium used its "smart contracts" to facilitate exchange of these currencies between buyers and sellers. Uranium incentivized its users to make deposits into liquidity pools by paying "rewards tokens" in exchange for these deposits. Id. ¶ 4.

The Indictment alleges that, on or about April 8, 2021, Spalletta exploited a glitch in Uranium's system that enabled him to withdraw $1.4 million worth of cryptocurrency to which he was not entitled. Id. ¶ 5. He did this by making a deposit into a Uranium liquidity pool and then using the "EmergencyWithdraw" function to immediately withdraw the full amount he had deposited. Then, Spalletta used the regular "Withdraw" function to request a withdrawal of "zero" tokens. Because of an apparent flaw in Uranium's system, Spalletta's account balance never reset to zero. The result was that every time he would withdraw "zero" tokens,

the system would disburse cryptocurrency to him, even though he had already withdrawn the entire amount he had initially deposited and should not have been entitled to any further withdrawal. Id. Spalletta later referred to this in a text message as "a crypto heist" facilitated by "a bug in a smart contract." Id. ¶ 6.

After he had obtained $1.4 million in cryptocurrency through the first attack, Spalletta contacted Uranium to report a "bug" and entered negotiations to return a portion of the cryptocurrency he had withdrawn. See id. ¶¶ 6-7. A Uranium representative agreed to allow Spalletta to keep $386,000 in cryptocurrency as a "bug bounty" if he returned the rest.[1] Id. ¶¶ 7-8.

Instead, approximately three weeks later, Spalletta committed a second attack on Uranium's platform. Relying on a different apparent system error, which "used the number 1,000 when it should have used the number 10,000," Spalletta made a series of transactions through which he extracted over $53 million in cryptocurrency from 26 different liquidity pools. See id. ¶¶ 9-11. For instance, Spalletta initiated a transaction in which he deposited near-zero quantities of the U92 and BUSD cryptocurrency

[1] According to the Indictment, "[a] bug bounty is a payment offered to a person who identifies an error in a computer program or system." Id. ¶ 7.

tokens, and in exchange withdrew nearly all of these two currencies from the Uranium liquidity pool. Id. ¶ 10.

Spalletta ultimately withdrew "the overwhelming majority of cryptocurrency that Uranium possessed." Id. ¶ 11. With its liquidity pools almost completely depleted, Uranium was no longer able to operate as a cryptocurrency exchange. It shut down almost immediately after Spalletta's second attack. Id.

Finally, the Indictment alleges that Spalletta "took a number of steps to conceal that he was the individual who committed the [two attacks] by laundering the funds he fraudulently obtained." Id. ¶ 13. One way he did this was by sending his cryptocurrency through a "cryptocurrency mixer," which obscured its source and origin. Id. ¶¶ 14-18. Spalletta also used intermediaries to make purchases on his behalf using the fraudulently obtained funds. Id. ¶ 18.[2]

As noted, the Indictment brings two counts arising out of this sequence of events. First, it charges Spalletta with violating the CFAA by knowingly transmitting a code or command and, "as a result of such conduct, intentionally caus[ing] damage to a protected computer." Id. ¶ 25; see also 18 U.S.C. §§ 1030(a)(5)(A)

[2] The Indictment further alleges that Spalletta used the fraudulently obtained funds to obtain, among other things, rare trading cards and antique Roman coins. See Indictment ¶¶ 19-24.

& 1030(c)(4)(B)(i). Second, the Indictment charges Spalletta with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

On June 11, 2026, Spalletta moved to dismiss the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v), on the grounds that the Indictment lacks sufficient specificity and fails to state an offense. See ECF No. 13 ("Mot."). Following receipt of full motion briefing by the parties, the Court held oral argument on July 24, 2026. On July 30, 2026, the Court issued a "bottom-line" order denying Spalletta's motion. See ECF No. 17. This Opinion sets forth the reasons for that Order.

## II. Legal Standard

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."[3] United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012). Additionally, "[a]n indictment can also be challenged on the grounds that it lacks required specificity." United States v. Murgio, 209 F. Supp. 3d 698, 705 (S.D.N.Y. 2016). However, for an indictment "to satisfy the pleading requirements of [Fed. R. Crim. P.] 7(c)(1), [it] need do little more than to track the

[3] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013). "Put differently, the indictment need only allege the core of criminality the Government intends to prove at trial, since the indictment is read . . . to include facts which are necessarily implied by the specific allegations made." Murgio, 209 F. Supp. 3d at 706.

## III. Analysis

The Indictment here sufficiently alleges both a violation of the CFAA and the federal money laundering statute. The Court takes each of the two counts in turn.

### A. Violation of the Computer Fraud and Abuse Act (Count One)

The CFAA makes it unlawful to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A). This subsection of the CFAA "contains at least two essential conduct elements." United States v. Calonge, 74 F.4th 31, 35 (2d Cir. 2023). It "bars (1) knowingly causing the transmission of a program and (2) intentionally causing damage." Id. The Indictment adequately here alleges both.

In the main, the Government's theory is that, as alleged in the Indictment, Spalletta intentionally exploited vulnerabilities in Uranium's platform to extract so much

cryptocurrency that the system no longer functioned. Thus, Spalletta knowingly transmitted a series of commands to the Uranium platform and, as a result, intentionally made changes to the platform that rendered it inoperable. Those allegations suffice to survive the instant motion.

Spalletta's motion to dismiss raises three statutory challenges to the Government's theory and one constitutional challenge. First, he argues that the Indictment does not allege that he caused "damage" to Uranium's system within the meaning of the CFAA. Second, he argues that the Indictment does not allege that he acted "without authorization" within the meaning of the statute. Third, he argues that the Indictment does not allege any damage to a "protected computer." Finally, Spalletta contends that, even if the Indictment alleges a CFAA violation, the statute is nevertheless unconstitutionally vague as applied to his conduct. The Court rejects each of these arguments.

**1. Damage**

On the Government's view, Spalletta caused "damage" to the Uranium system — within the meaning of the CFAA — when he withdrew so much cryptocurrency from the liquidity pools that Uranium's smart contracts were no longer able to function. The Court agrees.

As defined in the CFAA, "the term damage means any impairment to the integrity or availability of data, a program,

a system, or information." 18 U.S.C. § 1030(e)(8). This definition "focus[es] on technological harms — such as the corruption of files — of the type unauthorized users cause to computer systems and data." Van Buren v. United States, 593 U.S. 374, 391-92 (2021). "Put another way, although physical damage to the computer is not necessary, damages . . . under the statute are inextricably intertwined with a harm to the computer system itself, its data, or delivery of service." Life's Fortune LLC v. Serenu Inc., No. 24-CV-5066, 2026 WL 787928, at *13 (S.D.N.Y. Mar. 20, 2026). Put more plainly, a defendant causes damage within the meaning of the CFAA when the relevant "system no longer operates as it did when it first came into the owner's possession and has an unwanted characteristic, which, if known, would negatively impact the economic value of the computer system, unless time and money are expended to remove it." United States v. Y%20ucel, 97 F. Supp. 3d 413, 420 (S.D.N.Y. 2015).

Applied here, the Indictment plainly alleges damage to Uranium's systems. As alleged, Uranium's smart contracts — computer programs operating on the blockchain — require a certain threshold level of cryptocurrency to function as an automated exchange. As soon as Spalletta removed large sums of cryptocurrency from the liquidity pools, the system could no longer operate. One can scarcely imagine more "typical consequences of hacking" than this. Van Buren, 593 U.S. at 392.

Spalletta points out that the Indictment does not allege that Uranium's code was "altered, replaced, or corrupted." ECF No. 14, at 7. He urges that "[a] program that runs as written — even buggy code — has not had its integrity impaired." Id. The Court finds no support for such a sweeping proposition. To the contrary, courts have repeatedly found CFAA violations in cases where the defendant technically used the system as it was designed but nonetheless did so in a way that rendered the system inoperable. See United States v. Mitra, 405 F.3d 492, 497 (7th Cir. 2005) (affirming a CFAA conviction where the defendant "blanketed" a city-wide emergency responder radio system with a radio signal and rendered the system unusable); Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC, 774 F.3d 1065 (6th Cir. 2014) (affirming a civil CFAA violation where the defendant made fraudulent bids on an auction system, crowding out legitimate bidders and interfering with the system's ability to function as intended); United States v. Carlson, 209 F. App'x 181, 185 (3d Cir. 2006) (summary order) (affirming a CFAA violation where a defendant's use of spam emails to flood an inbox prevented the user from "access[ing] his other good emails").

As the Sixth Circuit put it Yoder, Spalletta's "conduct interfered with the ability of the [Uranium] platform to function as intended." 774 F.3d at 1073. That he did so by

exploiting a flaw in the system, rather than by creating the flaw in the system, does not change the result. As alleged, Spalletta's conduct interfered with the proper functioning of Uranium's software. That constitutes damage under the CFAA.

Finally, Spalletta argues that this conclusion "collapse[s] the distinction between 18 U.S.C. § 1030(a)(4) and section 1030(a)(5)(A) that Congress carefully drew." ECF No. 14, at 9. Not so. These two provisions concern different types of conduct. Section 1030(a)(4) concerns unauthorized access to a protected computer, while § 1030(a)(5) concerned unauthorized damage to a protected computer. Regardless of the definition of "damage" the Court adopts, the two provisions still cover distinct offenses and require establishing a different set of elements.[4]

**2. Without Authorization**

The Court likewise concludes that the Indictment alleges Spalletta damaged the Uranium system "without authorization." To begin, it is important to note that "without authorization" as it appears in § 1030(a)(5)(A) refers to the result of "intentionally caus[ing] damage," and not to the act of

[4] The Government has not argued, and the Court does not conclude, that all unauthorized and fraudulent withdrawals of funds — which might state a violation 18 U.S.C. § 1030(a)(4) — necessarily inflict damage for purposes of § 1030(a)(5). All the Court concludes is that where, as here, a defendant removes cryptocurrency from a computer system in a way that renders that system inoperable, he has caused damage within the meaning of the CFAA.

"knowingly caus[ing] the transmission of a program, information, code, or command." By contrast, the neighboring CFAA provision makes it unlawful to "intentionally access[] a protected computer without authorization, and as a result of such conduct, recklessly cause[] damage." 18 U.S.C. § 1030(a)(5)(B). The latter provision focuses the inquiry on whether the individual accessed the system without authorization. Meanwhile, the relevant inquiry under § 1030(a)(5)(A) is whether the individual had authorization to cause the damage that resulted from their conduct.

Applied here, the operative question is whether, as alleged, Spalletta had authorization to exploit the imperfections in Uranium's system to drain more than $53 million in cryptocurrency from its liquidity pools. Plainly, he lacked such authorization.

Indeed, as the Indictment alleges, Spalletta himself <u>knew</u> he was not authorized to make these withdrawals. For instance, Spalletta referred to the first attack as a "crypto heist" and boasted that he "exploited" a "bug in a smart contract." Indictment ¶ 6. Taken together, the Indictment sufficiently alleges that Spalletta drained Uranium's liquidity pools — rendering the system inoperable — without authorization.

Spalletta makes two arguments to the contrary, but neither is persuasive. First, he points out that the Indictment does not

charge him with having bypassed any form of security system to obtain funds from the liquidity pools. Instead, it charges him with using Uranium's system exactly as its programmers coded it. Spalletta did not alter Uranium's code but merely took advantage of a mistake Uranium made in setting up its own network.

This argument is inconsistent with both precedent and common sense. As to the former, the Second Circuit has upheld convictions under § 1030(a)(5)(A) where the defendant caused damage to a computer system without altering its code or circumventing its security protocols. For instance, in United States v. Calonge, the defendant was charged with using her employee credentials to access the company's human resources database and delete large amounts of data. 74 F.4th at 33-34. She did not "hack" the system or surmount some technical barrier to entry. Instead, she took advantage of her employer's failure to restrict her credentials and caused unauthorized damage to a computer system. The Second Circuit easily affirmed her conviction under § 1030(a)(5)(A). Id. at 37.

Common sense reinforces this conclusion. Consider a person who discovers that a jewelry store has left its door unlocked. Nobody would argue that the jewelry store has "authorized" the passerby to enter the store and take what he likes. Even closer to the mark, consider a person who learns that a faulty ATM dispenses hundred-dollar bills when a user requests tens. The

user is not authorized to siphon cash out of the machine by repeatedly taking advantage of the glitch in the system.

In other words, it is immaterial that Uranium's code technically permitted Spalletta to withdraw more cryptocurrency than he was entitled to. The Court nonetheless concludes that, as alleged, his withdrawals were without authorization.

Spalletta's second argument is that, even if there does not need to be a technical barrier to entry, the Indictment still needs to allege with specificity the "non-code source of authorization that [he] violated." ECF No. 16, at 5. But such specificity is not required at this stage. Rather, it is sufficient that the Indictment alleges, as it does, that Spalletta was not authorized by Uranium to make these withdrawals and that he knew as much. While greater specificity may be required at trial, at this stage, the Government has met its burden to "allege the core of criminality [it] intends to prove at trial." Stringer, 730 F.3d at 124.

**3. Protected Computer**

The CFAA defines "protected computer" to include any computer that "is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). This definition

"essentially covers every computer connected to the internet." Calonge, 74 F.4th at 35. Spalletta argues that because the Indictment describes Uranium as a "decentralized exchange," any damage he allegedly caused was not to a "device" or "facility" within the meaning of the CFAA. ECF No. 16, at 2. The Court disagrees.

The Indictment alleges that "Uranium operated on a decentralized network of computers that were connected to the internet and used in an affected interstate commerce." Indictment ¶ 2. Put more simply, Uranium operated a complex computer program across a large number of devices. By alleging damage to that program, the Indictment alleges damage to a protected computer within the meaning of the CFAA.

**4. Vagueness**

Finally, Spalletta argues that even if the Indictment alleges a CFAA violation, § 1030(a)(5)(A) is unconstitutionally vague as applied to his conduct. This argument is premature. Courts in this Circuit have repeatedly declined to pass on as-applied vagueness claims at the motion to dismiss stage. See United States v. Shvartsman, 722 F. Supp. 3d 276, 299 (S.D.N.Y. 2024); see also United States v. Peraire-Bueno, No. 24-CR-293, 2025 WL 2062021 (S.D.N.Y. July 23, 2025). That is because "[a]n implicit requirement of the vagueness test is that it must be clear what the defendant did." Shvartsman, 722 F. Supp. 3d at

299. In other words, "the Court requires full factual development at trial before it can determine whether the relevant statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause." Id.; see also United States v. Phillips, 690 F.Supp.3d 268, 293 (S.D.N.Y. 2023).

Moreover, if one focuses solely on the allegations set forth in the Indictment, Spalletta's conduct fits comfortably within the ambit of the CFAA. Indeed, "[b]ecause the statute at issue here contains a scienter requirement, [Spalletta's] vagueness challenge must be met with some measure of skepticism, at least with regard to the fair notice prong" of the relevant inquiry. United States v. Roberts, 363 F.3d 118, 123 (2d Cir. 2004). "That skepticism is further buttressed by the government's [allegation] that the defendant[] actually believed what [he] [was] doing was illegal." Id. Accordingly, while the Court technically declines to pass on Spalletta's vagueness claim at this stage, it seems doubtful at best.[5]

---

[5] Spalletta urges that even if there is not a notice problem because of the CFAA's scienter requirements, application of the CFAA to his conduct is still unconstitutionally vague because it invites arbitrary enforcement. The Court declines to pass on this formulation of Spalletta's vagueness argument at this stage as well.

**B. Money Laundering Prohibition (Count Two)**

Because the Court has already concluded that the Indictment adequately alleged a violation of § 1030(a)(5)(A), the Court easily concludes that the Indictment also alleges a violation of the federal money laundering statute. To allege a violation of 18 U.S.C. § 1956(c)(7), the Indictment need only allege that "the person knows that the property involved in the financial transaction represents the proceeds of any form of felonious activity and knows that the financial transaction is designed in whole or in part to conceal or disguise the source of those proceeds." United States v. Maher, 108 F.3d 1513, 1520 (2d Cir. 1997). Here, the Indictment contains ample allegations that Spalletta knew he was engaged in unlawful activity with respect to Uranium — namely, a violation of the CFAA — and that he took steps to conceal the source of the cryptocurrency he had obtained through that unlawful activity.[6] See supra Section III.A.2. In particular, Spalletta used multiple cryptocurrency mixers, blockchains, and intermediaries to obscure the source of the cryptocurrency he obtained from Uranium. See Indictment

[6] Indeed, Spalletta's argument to the contrary is almost entirely premised on the conclusion that the Indictment failed to allege a CFAA violation — a conclusion the Court has now rejected.

¶¶ 13-18. These allegations suffice to charge a violation of § 1956(c)(7).

## IV. Conclusion

In sum, the Indictment adequately alleges both violation of the CFAA and violation of money laundering prohibition. For the foregoing reasons, the Court issued its July 29, 2026 "bottom-line" order denying Spalletta's motion. Counsel are reminded that trial in this case is firmly fixed to begin on September 28, 2026.

New York, NY
August 25, 2026

JED S. RAKOFF, U.S.D.J.