UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JONATHAN SPALLETTA,

Defendant.

**26 Cr. 118 (JSR)**

**THE GOVERNMENT'S *DAUBERT* MOTION TO PRECLUDE THE TESTIMONY OF DEFENSE EXPERT STEVEN BASKERVILLE**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

William C. Kinder
Kevin Mead
Shaun Werbelow
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1
BACKGROUND ........ 1
APPLICABLE LAW ........ 2
ARGUMENT ........ 6
I. The Court Should Preclude the First Opinion ........ 6
A. The First Opinion is Improper and Unhelpful to the Jury ........ 6
B. The First Opinion is Irrelevant ........ 9
C. There is an Insufficient Basis for the First Opinion ........ 12
II. The Court Should Preclude the Second Opinion ........ 12
A. The Second Opinion is an Impermissible and Incorrect Legal Conclusion ........ 14
B. There is an Insufficient Basis for the Second Opinion ........ 17
III. The Court Should Preclude the Third Opinion ........ 21
CONCLUSION ........ 23

## PRELIMINARY STATEMENT

The Government respectfully moves to preclude the testimony of defense expert Steven Baskerville. Mr. Baskerville proposes to testify that, among other things, (i) the Government's evidence that the defendant committed the Uranium exploits is insufficient, (ii) the Government cannot prove the elements of "damage" or "without authorization" because, according to him, "software code is absolute law," and (iii) that individuals have many legitimate reasons to use cryptocurrency mixing services like Tornado Cash.

The first opinion should be precluded because (i) an expert cannot opine about the sufficiency of evidence, as that role belongs to the jury, (ii) the opinion is irrelevant, and (iii) Mr. Baskerville has not offered a sufficient basis for the opinion in his disclosure. The second opinion should be precluded because (i) Mr. Baskerville's legal conclusions infringe on the role of the Court, (ii) he has not offered a sufficient basis for the opinion, and (iii) he is not qualified to offer it. The third opinion should be precluded because (i) Mr. Baskerville is not qualified to offer the opinion; and (ii) he has provided no methodology for that third opinion. In the alternative, the Court should order a *Daubert* hearing.

## BACKGROUND

On August 26, 2026, the defendant served an expert notice for Mr. Baskerville, which is attached as Exhibit A, and his curriculum vitae, which is attached as Exhibit B. In addition, in response to the Government's questions, the defense provided an email with additional information about Mr. Baskerville's qualifications that appears to have been written—but not signed—by Mr. Baskerville and is attached as Exhibit C.[1] Mr. Baskerville is a former Special Agent with the

[1] To the extent this email is intended to supplement or correct the prior disclosure, it is not sufficient for it merely to be said in a letter from a lawyer. Rather, Mr. Baskerville must himself so state, in a signed disclosure. *See* Fed. R. Crim. Pro. 16(b)(1)(C)(vi) ("The defendant must

United States Secret Service who is now employed as a "Cybersecurity Consultant" for the law firm representing the defendant.[2] Mr. Baskerville purports to offer three primary opinions, which in his own words are:[3]

- "The blockchain and forensic tracing evidence [by the Government] reflects a wallet-to-wallet, 'closed-system' model that . . . lacks device-side or session-level data—such as IP logs or active session records—placing a specific individual at the keyboard during the April 2021 Uranium Finance events." Ex. A at ¶ 46 (the "First Opinion").[4] In other words, Mr. Baskerville proposes to testify that the Government's evidence is insufficient to prove the identity of the individual who committed the Uranium exploits.

- "[As to both Uranium exploits,] from a technical forensics standpoint, the underlying computer network infrastructure was never disrupted, crashed, or manipulated without authorization. Rather, the smart contract operated exactly as it was programmed to." Ex. A at ¶ 15 (the "Second Opinion").[5] The first paragraph of the Second Opinion further explains Mr. Baskerville's opinion that "software code is absolute law." Ex. A at ¶ 17. In other words, Mr. Baskerville proposes to testify that the charged conduct does not constitute a crime.

- "From a digital forensics and decentralized finance (DeFi) perspective, an individual's engagement with a mixing service can be interpreted as a standard, lawful effort toward privacy optimization and 'anonymity mining.' There are highly practical, professional reasons why a legitimate blockchain expert would utilize these protocols." Ex. A at ¶¶ 42; *see also id.* at ¶¶ 16, 40, 46 (the "Third Opinion").[6] In other words, Mr. Baskerville proposes to testify that use of a cryptocurrency mixing platform like Tornado Cash "can be interpreted as [] standard [and] lawful." *Id.*

## **APPLICABLE LAW**

---

supplement or correct the defendant's disclosures in accordance with [the foregoing requirements, which include the proffered expert signing].").

[2] https://federal-lawyer.com/steven-baskerville/.

[3] The defense informed the Government on a phone call that if Mr. Baskerville were not qualified as an expert, it might seek to offer him as a fact witness to testify about topics like those in the expert notice. Presenting Mr. Baskerville as a fact witness as to those topics would raise many of the same issues set forth in this brief, as well as some new ones. If the defense ultimately attempts to offer Mr. Baskerville as a fact witness, the Government reserves the right to make further application for preclusion to the Court.

[4] The First Opinion encompasses paragraphs 14, 31, 37, and section (i) of paragraph 46.

[5] The Second Opinion encompasses paragraphs 15, 17-39, and section (ii) of paragraph 46.

[6] The Third Opinion encompasses paragraphs 16, 40-44, and section (iii) of paragraph 46.

An expert must be "qualified, reliable, and helpful" to be "permitted to testify." *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliabl[y] appl[ied]" to the case. Fed. R. Evid. 702.

A threshold requirement is that the proposed witness is qualified as an expert. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005); *see Querub v. Hong Kong*, 649 F. App'x 55, 56-57 (2d Cir. 2016) (affirming exclusion of expert familiar only with foreign accounting standards and explaining that because the expert "is not qualified to opine on [Public Company Accounting Oversight Board] standards, she has no basis for comparing them with other standards").

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). District courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993), and their exclusion of

expert testimony will be affirmed unless it constitutes an abuse of discretion, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

The requirement that the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" serves a dual purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541, 546 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022).

Moreover, while the testimony must be directly pertinent to an issue that the jury has to resolve, it must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory.").

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliabl[y] appl[ied] . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been

subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court should not "admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403. Because "[e]xpert evidence can be both powerful and quite misleading [due to] the difficulty in evaluating it," a court, "in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595; *see Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (explaining that Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation").

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was amended in 2022 to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

# ARGUMENT

## I. The Court Should Preclude the First Opinion

Mr. Baskerville's First Opinion is that "there is a lack of server-side or device-side logging that explicitly identifies the specific user behind the keyboard at the precise chronological timestamps of the smart contract incidents," Ex. A at ¶ 14, or, in another formulation, that "[t]he blockchain and forensic tracing evidence reflects a wallet-to-wallet, 'closed-system' model that . . . lacks device-side or session-level data—such as IP logs or active session records—placing a specific individual at the keyboard during the April 2021 Uranium Finance events," Ex. A at ¶ 46. In other words, Baskerville seeks to testify that he views the Government's evidence as insufficient to identify the individual who committed the charged Uranium exploits.

The First Opinion should be precluded because (i) an opinion as to whether evidence is sufficient is inadmissible, as it invades the factfinding province of the jury; (ii) Mr. Baskerville has analyzed an incomplete set of the Government's evidence (and some evidence that the Government does not plan to introduce) such that his opinion is irrelevant and likely to mislead the jury; and (iii) there is an insufficient basis for Mr. Baskerville's conclusion.

### A. The First Opinion is Improper and Unhelpful to the Jury

An expert may not—as Mr. Baskerville proposes to do—testify as to whether the evidence on a particular point is sufficient.

Although Federal Rule of Evidence 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Advisory Committee notes go on to say that Rules 701, 702, and 403 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." As the Second Circuit has explained:

> Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. When an expert undertakes to tell

> the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination.

*United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (cleaned up) (emphasis in original).

Here, a major dispute between the parties will be whether the Government has introduced sufficient evidence to establish beyond a reasonable doubt that the defendant was the perpetrator of the Uranium exploits. That determination is a core part of the jury's role, and allowing a purported expert witness to testify as to the sufficiency of the evidence would usurp the province of the jury. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 505 (S.D.N.Y. 2009) ("Both parties' experts will provide opinions crucial to this highly technical case, but decisions concerning whether the facts presented fulfill the legal requirements of knowledge, reasonableness, irresponsibility, *sufficiency*, and intent remain the exclusive province of the jury.") (emphasis added).

Moreover, sufficiency is a legal conclusion, and experts are prohibited from offering testimony as to such legal conclusions. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts . . . testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice"); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) ("in reviewing the use of expert testimony, we also look to see if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it") (cleaned up); *see also Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (expert testimony that defendant's conduct was

"negligent" or not "justified under the circumstances" was improper because it "merely told the jury what result to reach") (cleaned up).

The language of the First Opinion makes clear that Mr. Baskerville is attempting to opine on the sufficiency of the evidence. He states that the Government's evidence is insufficient to "explicitly identif[y] the specific user behind the keyboard at the precise chronological timestamps of the smart contract incidents," Ex. A at ¶ 14, cannot "identify[] the user that pushed the transaction execution buttons at the moments of the two April 2021 Uranium Finance events," Ex. A at ¶ 14, that "the reviewed evidence lacks direct identifier data . . . definitively linking the user to specific accounts (i.e. [two accounts belonging to the defendant]) at the precise times the incidents occurred," Ex. A at ¶ 37, and that the Government's evidence "lacks device-side or session-level data . . . placing a specific individual at the keyboard during the April 2021 Uranium Finance events," Ex. A at ¶ 46. This is not a proper subject for expert testimony and should be precluded.

Furthermore, even assuming that the First Opinion is anything other than an opinion about sufficiency (of only a portion of the evidence), it should still be precluded because the entire First Opinion is improperly proffered "solely for the purpose of constructing a factual narrative based upon record evidence," and is impermissible for that independent reason. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *see also CCM Touring LLC v. Moonbug Ent. Ltd.*, No. 23 Civ. 7116 (VSB) (VF), 2026 WL 848392, at *15 (S.D.N.Y. Mar. 27, 2026) (*quoting Highland Cap.* for the same point); *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019) ("Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and

expertise; nor is such a narration traceable to a reliable methodology."); *Wells Fargo Bank, N.A. v. United States Life Ins. Co. in City of New York*, No. 22 Civ. 8606 (JPC), 2025 WL 2220948, at *23 (S.D.N.Y. Aug. 4, 2025) (*quoting ScentSational Techs.*). The First Opinion reflects no expertise or methodology whatsoever. It offers solely Mr. Baskerville's narration of the evidence and his assessment that the limited proof he reviewed is insufficient to identify the defendant.

**B. The First Opinion is Irrelevant**

Mr. Baskerville's opinion is also irrelevant, because it does not focus on the correct evidence. In a criminal case with no depositions or other pretrial civil discovery, it is difficult to imagine how a defense expert could ever testify as to the sufficiency of the Government's evidence because that expert would not be fully aware of the Government's evidence until the Government rested. Here, however, the failure is particularly clear:

- To the extent Mr. Baskerville purports to base his opinions on the Government's own forensics, he appears to use only a preliminary analysis that will not be before the jury. By way of background, before charging, the Government consulted with forensic investigators at TRM Labs to investigate the Uranium exploits, and it produced reports by TRM Labs in discovery. The Government does not intend to have employees of TRM Labs testify at trial. It has instead retained Mr. Alex Pettyjohn and Professor Amin Shams to testify at trial.[7] Mr. Baskerville appears to have reached his First Opinion almost entirely by reviewing the preliminary reports from TRM Labs, Ex. A at ¶¶ 2, 11, 32, 35, 37, even though those reports will not be presented to the jury and no one from TRM Labs will testify at trial.

- At the time Mr. Baskerville submitted his report, he did not have the Government's witness list or Section 3500 material, meaning he was unaware of what testimony the Government planned to offer to prove that the defendant committed the Uranium exploits.

- At the time Mr. Baskerville submitted his report, while he had access to the Government's Rule 16 discovery, he did not have the Government's trial exhibits, meaning he was unaware of the specific evidence the Government planned to introduce to prove that the defendant committed the Uranium exploits.

[7] The expert disclosures for Mr. Pettyjohn and Professor Shams were served on the defendant on August 3, 2026 and submitted to the Court on August 28, 2026.

As a result, Mr. Baskerville's First Opinion is irrelevant to the jury. Mr. Baskerville's loose opinion as to the sufficiency of the Government's identity evidence also appears to be irrelevant and based on dubious methodology, because it does not even appear to consider some of the overwhelming evidence that the defendant committed the Uranium exploits, such as:

- The defendant confessed in a message that he committed a "crypto heist" with a description of facts matching the first Uranium exploit.
- The defendant had a picture on his cellphone of the conversation in which he agreed to return funds from the first Uranium exploit to Uranium in exchange for calling the exploit a sham "bug bounty."
- The defendant had the private access keys for approximately $33 million of cryptocurrency stolen from the Uranium exploits in an encrypted folder on his computer.
- The defendant had a file titled "uranium_bug" on his computer with an explanation of how to commit the second Uranium exploit.
- Several days before the second Uranium exploit, the defendant said in writing, "For the Uranium bug, Im still trying to decide what to do with it to extract some value in a legit way."

And even if Mr. Baskerville actually considered all the Government's evidence, his opinion would still be irrelevant because it appears to be an attack on the quality and sufficiency of the investigation, which is impermissible. "As a general matter, the quality and scope of the Government's investigation are not appropriate lines of examination . . . ." *See United States v. Aleynikov*, 785 F. Supp. 2d 46, 65 (S.D.N.Y. 2011), *rev'd on other grounds by* 676 F. 3d 71 (2d Cir. 2012). Courts in this District and in this Circuit therefore routinely preclude attempts by the defense to shift the focus at trial from the defendant's guilt to the sufficiency or propriety of the investigation. *See, e.g., United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.") (cleaned up); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (barring defendant from "belabor[ing] the details of the

investigation's chronological development" as it would "be irrelevant to the central question of Demosthene's guilt or innocence, and as such, is inadmissible"); *United States v. Ray*, No. 20 Cr. 10 (LJL), 2022 WL 558146, at *7 (S.D.N.Y. Feb. 24, 2022) (evidence of alleged insufficiencies in an investigation is "not relevant under Rule 401, and even if it did have any probative value, such value would be substantially outweighed by the danger of unfair prejudice, and jury confusion under Rule 403"); *United States v. Duncan*, No. 18 Cr. 289 (SHS), 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019) ("The length of [a government] investigation, the investigative techniques used, and the fact that [a defendant] was not initially a target of [an] investigation are all irrelevant . . . ."); *United States v. Chang*, No. 18 Cr. 00681 (NGG) (CLP), 2024 WL 3567006, at *3 (E.D.N.Y. July 29, 2024) ("Should the Defense attempt to challenge the adequacy of the Government's investigation through Government or law enforcement witnesses, it will be precluded from doing so."); *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 5818107, at *3 (S.D.N.Y. Oct. 19, 2018) (rejecting request for documents that defense claimed "pertain to the lack of thoroughness and completeness of the Government's investigation" because "the Government is not on trial in this case, and the jury will not be asked to pass on the adequacy of its investigation"); *United States v. Montanez*, No. 23 Cr. 186 (NGG), 2024 WL 4582387, at *6 (E.D.N.Y. Oct. 25, 2024), *supplemented*, No. 23 Cr. 186 (NGG), 2024 WL 4607479 (E.D.N.Y. Oct. 29, 2024) ("Put differently, the way in which the Government conducted its investigation is not relevant to the Government's burden of proof at trial.").

Relatedly, the First Opinion challenges the Government's failure to include investigative techniques that would have led to "real-time IP telemetry, active session logs, or live location geo-fencing." Ex. A ¶ 14. But as the Second Circuit has explained, "the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and . . . the

failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged." *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000); *see also United States v. Carter*, No. 21-1005, 2022 WL 16909404, at *4 (2d Cir. Nov. 14, 2022) (summary order) ("the district court properly instructed the jurors that specific investigative techniques are not required"). Nor is the Government required to present any particular kind of evidence over others. This, too, is a reason that the First Opinion should be precluded as irrelevant.

**C. There is an Insufficient Basis for the First Opinion**

Mr. Baskerville's report contains virtually no support for the conclusion that the Government's anticipated evidence fails to "plac[e] a specific individual at the keyboard during the April 2021 Uranium Finance events." Ex. A at ¶ 46. The only paragraphs of the report that even attempt to support that claim are paragraphs 31 and 37. It is unclear why Mr. Baskerville views cryptocurrency tracing evidence—which is commonly used in cybercrime investigations and prosecutions—as insufficient to establish user identity. That is a failure of the written disclosure itself to present the bases and reasons for his opinion, but it is also a failure to establish that the proffered expert testimony "is the product of reliable principles and methods" that are "reliabl[y] appl[ied] . . . to the facts of the case." Fed. R. Evid. 702. Instead, the proffered First Opinion appears to be connected to the facts of the case "only by the *ipse dixit* of the expert." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court should preclude the First Opinion on this ground as well.

**II. <u>The Court Should Preclude the Second Opinion</u>**

The Second Opinion is essentially an opinion that the Government cannot prove the elements of "damage" or "without authorization" because, in the context of a decentralized finance platform, "code is law," and whatever the language of the computer code permits is necessarily

not criminal. That opinion is framed as follows: "From a technical forensics standpoint, the underlying computer network infrastructure was never disrupted, crashed, or manipulated without authorization. Rather, the smart contract operated exactly as it was programmed to." Ex. A ¶ 15.[8] The section of the report supporting the Second Opinion begins: "To understand how trades happen in decentralized finance, it helps to understand one simple rule: software code is absolute law." Ex. A ¶ 17. Mr. Baskerville's "code is law" opinion permeates much of his disclosure. *See generally* Ex. A at ¶ 15 ("From a technical forensics standpoint, the underlying computer network infrastructure was never disrupted, crashed, or manipulated without authorization."); ¶ 21 ("If a person uses a smart contract and gets a certain result, that result happened entirely because the program's code allowed it."); ¶ 46 ("both events [the Uranium exploits resulted from the automated execution of the protocol's published smart contract code . . . rather than any unauthorized code modification").[9]

The Second Opinion should be precluded because it impermissibly offers a legal conclusion, and one that this Court has already rejected. In addition, there is an insufficient basis for the Second Opinion, both in terms of Mr. Baskerville's qualifications and in the proffered explanation for that opinion.

---

[8] The Second Opinion makes up the bulk of Mr. Baskerville's report, and covers both Section IV (titled "The Mechanics of Smart Contracts and Decentralized Exchanges") and V (titled "Technical Analysis of the Uranium Finance Incidents").

[9] Paragraph 20 of Mr. Baskerville's report (which is part of the Second Opinion) references that "government agencies and intelligence groups" often offer bug bounties, and that such offers are important "particularly when contracted by U.S. defense and intelligence agencies to counteract against foreign actors." The Government has a separate objection to that quoted language, has conferred with the defense about that language, and understands that there is a substantial chance that the defense will agree not to elicit testimony like the quoted language in paragraph 20 even if Mr. Baskerville is permitted to offer the Second Opinion. If Mr. Baskerville is permitted to offer the Second Opinion and the defense chooses to elicit testimony like the quoted language, the Government reserves the right to make further application to the Court.

**A. The Second Opinion is an Impermissible and Incorrect Legal Conclusion**

"As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory."). Moreover, opinions "calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law" are inadmissible because they are not "helpful to the jury in carrying out its legitimate functions." *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) (cleaned up); *see also United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) ("in reviewing the use of expert testimony, we also look to see if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it") (cleaned up); *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.") (cleaned up); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (explaining the basis for the rule: "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

The Second Opinion is exactly the type of testimony that impermissibly instructs the jury as to the law. Mr. Baskerville claims that, in decentralized finance, there is "one simple rule: software code is absolute law." Ex. A ¶ 17. Mr. Baskerville cannot be permitted to testify that

"code is absolute law."[10] It is not his role to tell the jury what the law is, and the Second Circuit has repeatedly explained that offering such a legal conclusion is impermissible. *See Bilzerian*, 926 F.2d at 1294; *Scop*, 846 F.2d at 140. Such testimony must be precluded in all of its guises.

The Second Opinion cannot be characterized as anything other than an opinion as to the law. Courts routinely reject such testimony even where an expert more effectively seeks to disguise his legal conclusions. *See, e.g.*, *Bilzerian*, 926 F.2d at 1295 (expert testimony encompassing "legal conclusion" is "not admissible, and may not be made so simply because it is presented in terms of industry practice"); *Rezulin Prods.*, 309 F. Supp. 2d at 558 (excluding proposed expert testimony regarding purported "standards of [industry] conduct" that were "at best thinly-disguised legal or quasi-legal principles" because such testimony "would encroach on the court's prerogative to instruct on the law"); *GST Telecomm., Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y. 2000) (excluding expert testimony because the "standards of conduct espoused by the experts [were] not specialized knowledge" but rather were "in effect . . . legal conclusions" about particular transactions); *Sparta Com. Servs. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir. 2017) (affirming exclusion of expert testimony regarding "banking industry standards and practices" as "replete with legal conclusions"); *In re AIG, Inc. 2008 Sec. Litig.*, No. 08 Civ. 4772 (LTS), 2015 WL 13648082, at *1 n.2 (S.D.N.Y. Mar. 19, 2015) (excluding expert testimony that consisted of "legal assertions" that were "disingenuously . . . proffered [as a] 'factual' demonstration").

---

[10] The Second Opinion similarly includes a bizarre analogy about someone walking into an unlocked bank vault, with the suggestion that doing so is not criminal because "they have not broken the laws of physics." Ex. A ¶ 26. The analogy does not work—if someone walked into an unlocked bank vault and stole the money (as Mr. Baskerville implies happened here), they have plainly done something wrong. But regardless, Mr. Baskerville of course cannot be permitted to suggest to the jury that conduct that does not break "the laws of physics" is somehow lawful.

Compounding the issue, Mr. Baskerville's view of the law is erroneous and refuted by this Court's own decisions. Not only does Mr. Baskerville seek to impermissibly explain the law and how the law applies to the facts of the case, he gets the law and its application wrong. There was extensive briefing on the theories underlying the Second Opinion in the context of motion to dismiss briefing, and this Court held that those theories were incorrect. As to damage, the Court rejected the defendant's arguments, explaining that, "To the contrary, courts have repeatedly found CFAA violations in cases where the defendant <u>technically</u> used the system as it was designed but nonetheless did so in a way that rendered the system inoperable." Dkt. 18 at 9 (emphasis in original). And as to "without authorization," the Court explained, among other points, that "the Second Circuit has upheld convictions under § 1030(a)(5)(A) where the defendant caused damage to a computer system without altering its code or circumventing its security protocols." *Id.* at 12.

The Second Opinion would directly contradict the Court's prior ruling. Were Mr. Baskerville permitted to offer the Second Opinion, he would opine that the Government's evidence cannot establish the elements of "damage" and "without authorization," when the Court has already held that they can. *See, e.g.,* Ex. A at ¶ 15 ("From a technical forensics standpoint, the underlying computer network infrastructure was never disrupted, crashed, or manipulated without authorization."); ¶ 21 ("If a person uses a smart contract and gets a certain result, that result happened entirely because the program's code allowed it."); ¶ 27 ("In this case, cryptocurrency moved not because any computer was broken into or damaged, but because the Uranium Finance smart contracts contained built-in math errors."); ¶ 30 ("In both events, the public system took in data and carried out transactions strictly according to its own programmed math rules without any network breach or system damage."); ¶ 46 ("both events [the Uranium exploits resulted from the automated execution of the protocol's published smart contract code . . . rather than any

unauthorized code modification"). There is always harm in permitting an expert to offer such legal conclusions, but that harm is particularly serious where, as here, the expert's legal conclusions are wrong. *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (expert's "testimony as to the applicable legal standard was plainly erroneous, thus demonstrating the danger in allowing experts to testify as to their understanding of the law").

Finally, the Government has moved in its motions *in limine* to preclude under Rules 401 and 403 any arguments that "code is law." Dkt. 27 at 3-5. That is consistent with the Court's rulings on the motion to dismiss. Dkt. 18 at 9 ("The Court finds no support for such a sweeping proposition. To the contrary, courts have repeatedly found CFAA violations in cases where the defendant <u>technically</u> used the system as it was designed but nonetheless did so in a way that rendered the system inoperable.") (emphasis in original). It is also consistent with the ruling in a recent trial in this District involving defense attempts to make similar arguments as to decentralized finance. *See United States v. Peraire-Bueno*, No. 24 Cr. 293 (JGLC), 2025 WL 2753560, at *5 (S.D.N.Y. Sept. 29, 2025) ("the Court will not permit argument that effectively amounts to 'code is law'—that is argument that because the Code permitted the conduct or the Government does not regulate this conduct, the conduct was legal."). Here too, the Second Opinion should be precluded.

**B. There is an Insufficient Basis for the Second Opinion**

In the Second Opinion, Mr. Baskerville seeks to testify about decentralized finance, but he is not qualified to offer any such opinions.

In his report, Mr. Baskerville includes five paragraphs summarizing his qualifications. As to cryptocurrency, the report explains only that:

- "I have led complex federal investigations focused on . . . transnational cryptocurrency fraud." Ex. A ¶ 4.

- "Over the last 15 years, I have authored several white papers and training courses on various digital forensics subjects for federal, state, local, tribal, and territorial (SLTT) law enforcement partners. These include instruction on cryptocurrency hot-and-cold-wallet recovery, specifically: *Skimmer Forensics for SLTT Partners* (2022); *Ransomware Investigative Principles* (2022); *Cryptanalysis for SLTT Partners* (2023); *Intro to Hacking and Malware* (2023); *Operationalizing Academic Partners* (2024); and *Drone Analysis and Forensics* (2025)." Ex. A ¶ 8.

His four-page curriculum vitae mentions cryptocurrency only in the context of his "Teaching & Research Interests," which include "cryptocurrency tracking." Ex. B at 4.

The supplemental email defense provided explains that, "my leadership in this arena encompassed directing forensic examinations involving cryptocurrency transaction laundering (through the reverse engineering of cryptocurrency wallets such as Trezor and Ledger), illicit darkweb operations, business email compromise (BEC) schemes where proceeds were diverted to digital assets, and high-dollar cyber-enabled financial fraud prosecuted across multiple federal judicial districts." Ex. C. It goes on to state that, "my casework and academic instruction touched on smart contract mechanics, public blockchain transparency, and automated software execution rules for SLTT partners." Ex. C.

To the extent Mr. Baskerville has any experience with cryptocurrency, it appears to deal almost exclusively with cryptocurrency tracing. The supplemental email states that Mr. Baskerville's "casework and academic instruction touched on smart contract mechanics," but provides no further detail, and nothing about his report or C.V. suggest that he has anything near the level of experience with decentralized finance to qualify as an expert in the field. Yet the Second Opinion is exclusively about how decentralized finance functions in general and the meaning of the Uranium exploits given that they affected a decentralized finance platform. Mr. Baskerville is simply not "qualified as an expert by knowledge, skill, experience, training, or education" to offer such an opinion, Fed. R. Evid. 702, and the Second Opinion should be

precluded for that reason. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (affirming preclusion of expert testimony as to propriety of investigation when expert's "lack of experience investigating sexual assault and lack of familiarity with Title IX training and investigations rendered her unqualified to opine on the propriety of [such an] investigation"); *S.E.C. v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 407-13 (S.D.N.Y. 2019) (holding that expert's general experience in "finance and economics" did not qualify him to testify about the more narrow topic of "layering or Cross-Market Strategy"); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (expert's "expertise in the general area of structured finance" did not qualify him to present expert testimony on "synthetic CDOs, a very specific type of security"); *United States v. Menendez*, No. 23 Cr. 490 (SHS), 2025 WL 547794, at *5 (S.D.N.Y. Feb. 19, 2025) (anthropology professor with "impressive" credentials in area of Middle Eastern studies not qualified to opine on specific topic of "gift-giving among Middle Eastern cultures").

The report is similarly deficient as to the bases for the Second Opinion. Mr. Baskerville explained that:

> In evaluating the technical mechanics and progression of the April 2021 Uranium Finance events, my findings rely upon contemporaneous documentation produced at the time of the incidents. This includes post-mortem summaries, third-party technical analyses, and forensic assessments published by blockchain security firms and investigators, as well as contemporaneous project communications. I did not perform a direct de-compilation or independent review of the original smart contract source code repositories because the platform folded in 2021 and the code was deprecated.

Ex. A ¶ 12; *see also* Ex. C ("The technical analysis of the April 2021 Uranium Finance events relies upon contemporaneous public blockchain analyses, incident post-mortems, and security disclosures published immediately following the incidents.") In other words, Mr. Baskerville's "analysis" that led to the Second Opinion appears to simply be parroting what other individuals wrote about the Uranium exploits. That is not a sufficient basis for an expert opinion. *See In re*

*M/V MSC FLAMINIA*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("If an expert simply presents the findings and expert[] opinions of others, that expert must be independently qualified in the subject. For instance, an expert may certainly present the findings and conclusions of those whose work he or she supervised and that he or she could personally replicate if necessary. But a proffered expert may not simply pass off as their own, or serve as a vehicle for presenting, the opinions of others in subjects on which the proffered expert is not personally qualified."); *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 14 Civ. 00549 (VLB), 2018 WL 1525709, at *20 (D. Conn. Mar. 28, 2018) ("internet research is not an acceptable basis for an expert opinion"). Mr. Baskerville appears to have little to no expertise in decentralized finance mechanics and thus cannot synthesize these materials in a manner that would be helpful to the jury, as Rule 702 requires.

Moreover, the defendant provides no basis, reasons, or sources for Mr. Baskerville's conclusions about "the mechanics of smart contracts and decentralized exchanges" described in paragraphs 17-31. For that reason too, the Court should preclude Mr. Baskerville from offering the Second Opinion and the proffered testimony in those paragraphs.

Finally, the Second Opinion is not "the product of reliable methods reliably applied," *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239-40 (S.D.N.Y. 2018), and thus should be precluded. "To warrant admissibility" under Rule 702, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [an expert's] methodology and [his] conclusions." *Nimely*, 414 F.3d at 396. Thus, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (quoting *Joiner*, 522 U.S. at 146); *see also Shatkin* v. *McDonnell Douglas Corp.*,

727 F.2d 202, 208 (2d Cir. 1984) (rejecting expert methodology based on an "apples and oranges" comparison). Further, "reliability" requires that courts ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999)). Here, the Second Opinion does not appear to rely on any methodology, much less a methodology "reliable at every step," as required under Rule 702, *Amorgianos*, 303 F.3d at 267. The Second Opinion instead seems to be an unsourced repetition of the defendant's litigation position as set forth in his motion to dismiss.

For these reasons, the Court should preclude the Second Opinion in its entirety.

## III. <u>The Court Should Preclude the Third Opinion</u>

The Third Opinion suffers from similar issues as to Mr. Baskerville's qualifications and methodology.

Tornado Cash is a cryptocurrency mixing service expressly designed to obscure any connection between a customer's deposits and withdrawals. On August 8, 2022, in the middle of the period during which the defendant was using Tornado Cash to launder his Uranium fraud proceeds, the United States Department of Treasury, through its Office of Foreign Assets Control ("OFAC"), sanctioned Tornado Cash. OFAC sanctioned Tornado Cash due to its extensive use by cybercriminals, including North Korea's Lazarus Group, to launder illicit cryptocurrency.[11]

Mr. Baskerville frames the Third Opinion as, "utilizing a protocol like Tornado Cash aligns with the standard habits of a security-focused DeFi developer or consultant. It represents a tactical choice to safeguard personal financial data from public exposure, conforming to standard privacy

[11] Facts related to the Tornado Cash sanctions are described in greater detail in the Government's motions *in limine*.

engineering practices used across the technology sector," Ex. A ¶ 16, or that, "interacting with a mixing service such as Tornado Cash serves recognized, lawful privacy and security functions within the cryptocurrency industry, " *id.* ¶ 46. In the middle of the Third Opinion, he further states that, "[f]rom a digital forensics and decentralized finance (DeFi) perspective, an individual's engagement with a mixing service can be interpreted as a standard, lawful effort toward privacy optimization and 'anonymity mining.' There are highly practical, professional reasons why a legitimate blockchain expert would utilize these protocols." *Id.* at ¶ 42.

As described above, Mr. Baskerville is not qualified to offer any opinions about decentralized finance at all. *See supra* at 17-18. For that reason, he may not opine about Tornado Cash use "[f]rom a digital forensics and decentralized finance (DeFi) perspective." Ex. A at ¶ 42. Nor does he appear qualified to offer any opinions about cryptocurrency mixing services like Tornado Cash, even though the relevant section of his report is titled, "Understanding Crypto Mixing Services." Ex. A at p. 8. Neither the credentials section of his report, nor his C.V., nor the defense's supplemental email even mention cryptocurrency mixing services or Tornado Cash, let alone show any significant prior experience with them.

Further, even if Mr. Baskerville had some experience tracing cryptocurrency funds that went through mixing services during his time in law enforcement (and it does not appear that he does), that experience would hardly qualify him to opine as to why use of Tornado Cash "conform[s] to standard privacy engineering practices used across the technology sector," Ex. A at ¶ 16, "why a legitimate blockchain expert would utilize these protocols," *id.* at ¶ 42, why, "[i]n the Web3 ecosystem, privacy optimization is a recognized technical discipline," *id.* at ¶ 44, or why, "interacting with a mixing service such as Tornado Cash serves recognized, lawful privacy and security functions within the cryptocurrency industry," *id.* at ¶ 46. How to trace cryptocurrency

through Tornado Cash is an entirely separate issue from whether there are legitimate reasons to use Tornado Cash. *See supra* at 18-19 (collecting cases requiring a fit between the expert's experience and the opinion proffered).

The Third Opinion also contains minimal support for how Mr. Baskerville reached his conclusions, and appears to be based solely on unsupported speculation as to why someone might use a cryptocurrency mixer like Tornado Cash. *See, e.g., United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023) (Rakoff, J.) ("As the Supreme Court and the Second Circuit have long made clear in their holdings with respect to expert testimony under Federal Rule of Evidence 702 (applicable to both civil and criminal cases), a statement of an opinion's bases and reasons cannot merely be the ipse dixit of the expert from experience. Rather, an expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.") (cleaned up). His opinion further fails to mention (let alone grapple with) the fact that Tornado Cash was subject to OFAC sanctions during much of the time the defendant was using it.[12] That failure indicates the shaky foundation of the Third Opinion, and further counsels in favor of preclusion. In sum, the Third Opinion does not appear to be "the product of reliable principles and methods" that are "reliabl[y] appl[ied] . . . to the facts of the case." Fed. R. Evid. 702. It should therefore be precluded.

**CONCLUSION**

For the foregoing reasons, the Court should preclude Mr. Baskerville's proffered testimony. In the alternative, the Court should schedule a *Daubert* hearing prior to trial to test Mr.

[12] To the extent the defense interprets the Third Opinion as limited to the time period before OFAC imposed sanctions—a limitation nowhere indicated in the Third Opinion itself—then that opinion should be precluded under Rules 401 and 403 given the defendant's use of Tornado Cash even after the imposition of sanctions.

Baskerville's qualifications, methodology, and bases and reasons for those opinions.

Dated: New York, New York

September 14, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: */s/ Kevin Mead*
Kevin Mead
William C. Kinder
Shaun Werbelow
Assistant United States Attorneys
212-637-2211/2394/2439