UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 26-CR-118-JSR

JONATHAN SPALLETTA,

Defendant.
_______________________________________/

**DEFENDANT JONATHAN SPALLETTA'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S DAUBERT MOTION TO PRECLUDE THE TESTIMONY OF DEFENSE EXPERT STEVEN BASKERVILLE**

Respectfully Submitted By

**Shrey Sharma**
Oberheiden P.C.
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (516) 851-7725
Fax: (972) 559-3365
shrey@federal-lawyer.com

**Counsel for Jonathan Spalletta**

Dated: September 21, 2026

# TABLE OF CONTENTS


Table of Contents .................... i

Table of Authorities .................... ii

I. Preliminary Statement .................... 1

II. Background .................... 3

III. Applicable Law .................... 4

IV. Argument .................... 5

A. The First Opinion Is Not an Opinion on the Sufficiency of the Evidence. .................... 5

B. Any Remaining Gaps in the First Opinion Go to Weight, Not Admissibility. .................... 7

C. The Second Opinion Is a Factual, Forensic Account of the Two Exploits, Not a Legal Conclusion. .................... 7

D. The Appropriate Remedy as to the Second Opinion Is Narrowing, Not Wholesale Preclusion. .................... 8

E. Mr. Baskerville Is Qualified to Describe the Technical Mechanics of the Two Exploits. .................... 8

F. Reliance on Contemporaneous Technical Post-Mortems and Audits Is a Reliable Methodology. .................... 9

G. The Third Opinion Is a Proper, Experience-Based Opinion Within Mr. Baskerville's Established Field of Expertise. .................... 10

H. In the Alternative, the Court Should Hold a Daubert Hearing. .................... 11

V. Conclusion .................... 12

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ................................................passim

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482 (S.D.N.Y. 2009)............................................................................................................................6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)................................................................4, 8

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)..........................................................4

*Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016).................................................................9

*S.E.C. v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019)............................................10-11

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ..............................................................9

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................................6

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ..................................................................5-6

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999).............................................................4-5

*United States v. Menendez*, No. 23 Cr. 490 (SHS), 2025 WL 547794 (S.D.N.Y. Feb. 19, 2025) ..8

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013).......................................................6

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ..........................................................9

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 14 Civ. 00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018) ...............................................................10

**Statutes**

18 U.S.C. § 1030 ......................................................................................................................2, 8

**Rules**

Fed. R. Evid. 401 ............................................................................................................................7

Fed. R. Evid. 702 .....................................................................................................................passim

Fed. R. Evid. 704 .........................................................................................................................5-6

Fed. R. Crim. P. 16 ..........................................................................................................................2

**DEFENDANT JONATHAN SPALLETTA'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S DAUBERT MOTION TO PRECLUDE THE TESTIMONY OF DEFENSE EXPERT STEVEN BASKERVILLE**

Defendant Jonathan Spalletta respectfully submits this memorandum of law in opposition to the Government's motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, to preclude the testimony of defense expert Steven Baskerville.

## I. PRELIMINARY STATEMENT

The Government's motion does not identify a single unreliable methodology, and it does not identify a single subject on which Steven Baskerville lacks relevant experience. Instead, the Government asks this Court to strike three discrete, technically grounded opinions—each tethered to Mr. Baskerville's twenty-one years of cyber-investigative and digital-forensics experience and to his review of the specific technical record in this case—because those opinions cut against the Government's theory that Mr. Spalletta committed the two April 2021 Uranium Finance "exploits." That is not a proper basis for exclusion under Rule 702.

Properly understood, the First Opinion does not ask the jury to find the Government's evidence "insufficient." It explains, as a technical matter, what a "closed-system" blockchain-tracing model can and cannot show—namely, that wallet-to-wallet tracing, standing alone, does not include the device-side or session-level data that would independently confirm who was operating a given wallet at a given moment. That is technical, methodology-focused testimony of exactly the kind Rule 702 is designed to admit, and it is directly responsive to tracing evidence the Government itself intends to offer through its own retained experts.

The Second Opinion—that, from a technical forensics standpoint, neither Uranium Finance exploit involved a breach of, or unauthorized intrusion into, Uranium Finance's servers, and that

both exploits instead resulted from coding defects that caused the protocol's own published smart-contract code to execute exactly as written—is a factual, forensic account of how the exploits mechanically worked, not a legal conclusion about whether that conduct satisfies the elements of 18 U.S.C. § 1030.[1] The defense does not intend to elicit testimony inviting the jury to substitute Mr. Baskerville's legal conclusions for this Court's instructions, and it does not oppose a narrowly tailored order precluding the isolated "software code is absolute law" framing in ¶ 17 of the Report. What the defense does oppose is the wholesale exclusion of the underlying technical testimony—how each coding defect arose and was exploited, and the absence of any server-side breach—which remains relevant regardless of how the Court instructs the jury on "damage" and "authorization."

The Third Opinion—that privacy-enhancing protocols such as Tornado Cash serve recognized, and for many users lawful, functions within the cryptocurrency industry—rests on the same career of cyber-fraud and cryptocurrency-tracing experience that qualifies Mr. Baskerville to offer the First and Second Opinions, and it is offered to rebut any inference the Government may invite the jury to draw that use of a privacy tool is itself evidence of consciousness of guilt.

Any disputes about the completeness of the record Mr. Baskerville reviewed,[2] the strength of his conclusions, or the precise contours of his qualifications go to the weight of his testimony, not its admissibility, and are properly explored through cross-examination—"the traditional and

---

[1] Ironically, each of the Government experts intend to provide improper legal conclusions which would usurp the Court's role in defining the law and the jury's law in applying it. *See* Doc. 20 at 1.

[2] As the Government noted, the defense has provided supplemental information from Mr. Baskerville in response to the Government's informal request for further information. The defense will promptly serve a signed supplemental declaration from Mr. Baskerville confirming and formalizing the qualification detail set out in Exhibit C, which will moot the Government's objection that the email itself was not signed by the witness. *See* Mot. at 1 n.1; Fed. R. Crim. P. 16(b)(1)(C)(vi).

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The motion should be denied. In the alternative, the Court should hold a *Daubert* hearing before resolving these fact-intensive disputes.

## II. BACKGROUND

On August 26, 2026, the defense served an expert notice and report for Steven Baskerville (the "Report," attached to the Government's motion ("Mot.") as Exhibit A), along with Mr. Baskerville's curriculum vitae (Exhibit B) and a supplemental email addressing certain of his qualifications (Exhibit C).[1]

Mr. Baskerville is a retired Supervisory Special Agent with the United States Secret Service, where he served for twenty-one years. Report ¶ 4. Among other roles, he served as Lab Director of the USSS National Computer Forensics Institute ("NCFI") Lab from 2018 to 2025, where he directed a multi-million-dollar forensic research and development budget and supervised more than thirty forensic specialists. *Id.* ¶ 5. He holds the Certified Computer Forensics Examiner designation from the International Association of Computer Investigative Specialists and is proficient in the industry-standard forensic toolsets—EnCase, FTK, Cellebrite Physical Analyzer, Axiom, Wireshark, and Volatility, among others—used to investigate cybercrime and cryptocurrency fraud. *Id.* ¶ 6.

Mr. Baskerville was retained by the defense to evaluate the digital and financial evidence linked to two April 2021 exploits of the Uranium Finance decentralized-finance protocol. *Id.* ¶ 1. Based on his review of the Government's discovery—including HSI forensic extractions, TRM Labs cryptocurrency-tracing logs, cloud account data and financial records, HSI reports, and contemporaneous post-mortem and security-audit materials published following the exploits, *id.* ¶

11—he reached three opinions, summarized at pages 2 to 3 of the Government's motion and addressed in turn below.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony and "is 'guided' by" the framework set out in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Rule permits a qualified witness to offer an opinion where the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable principles and methods reliably applied to the facts of the case. Fed. R. Evid. 702.

That standard is, by design, a permissive one. "Rule 702's basic standard of relevance—that is, whether expert testimony will help the trier of fact—is a liberal one," and the Supreme Court has repeatedly emphasized that the gatekeeping inquiry is "flexible." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150 (1999). As the Advisory Committee's Note accompanying the 2000 amendment to Rule 702 explains, a review of the post-*Daubert* case law confirms that "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

An expert need not resolve every doubt about the completeness of the record reviewed or the certainty of the conclusion reached before testifying. "Disputes as to the strength of [an expert's] credentials, faults in his use of a [particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

At the same time, an expert may not usurp the role of the Court in instructing the jury on the law, or the role of the jury in applying that law to the facts. *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). But Federal Rule of Evidence 704(a) makes clear that "[a]n opinion is not objectionable just because it embraces an ultimate issue," and the Advisory Committee's Notes confirm that Rules 701, 702, and 403 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach"—without requiring exclusion of every opinion that touches on an issue the jury must ultimately decide. Fed. R. Evid. 704(a) & advisory committee's note. And where an expert's opinion rests on specialized experience rather than laboratory testing, Rule 702 does not require a particular methodology, only that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

## IV. ARGUMENT

### A. The First Opinion Is Not an Opinion on the Sufficiency of the Evidence.

The Government mischaracterizes the First Opinion as an opinion that "the evidence is insufficient" to establish identity. Mot. at 6. That is not what Mr. Baskerville says. He does not testify that the Government cannot prove identity, that reasonable doubt exists, or that the jury should acquit. He describes, at a technical level, the limits of a specific forensic technique—"closed-system" wallet-to-wallet tracing—and explains that this technique, standing alone, does not include the device-side or session-level data (IP logs, active session records, geo-fencing) that would independently confirm who was operating a particular wallet at a particular moment. Report ¶¶ 14, 31, 37, 46(i).

There is a meaningful difference between an expert telling the jury what ultimate result to reach and an expert explaining, from specialized knowledge, what a particular body of evidence

does and does not show, leaving the ultimate inference to the jury. Compare *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (barring testimony that "substitute[s] the expert's judgment for the jury's"), with Fed. R. Evid. 704(a) (an opinion is "not objectionable just because it embraces an ultimate issue") and *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts"). Mr. Baskerville's First Opinion falls on the permissible side of that line. It supplies the jury with technical groundwork about a specific category of forensic evidence; it does not purport to resolve the ultimate question of who committed the exploits, and it does not use the vocabulary of a legal conclusion (guilt, innocence, reasonable doubt, or the elements of any charged offense).

That distinguishes this case from the "sufficiency" testimony excluded in the authority the Government cites, which involved an expert opining directly that the evidence, taken as a whole, does or does not "fulfill the legal requirements" of a claim. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 505 (S.D.N.Y. 2009). Mr. Baskerville's First Opinion is narrower and more technical: it is confined to what one specific category of forensic evidence—closed-system blockchain tracing—can and cannot show, not a freestanding assessment of the sufficiency of the Government's case.

The First Opinion is not an improper attack on "the quality of the investigation" of the kind precluded in the cases the Government cites. Mot. at 10-11. Those cases bar defense arguments that the Government should have investigated more, used different techniques, or moved faster—arguments about the Government's diligence that are irrelevant to guilt. *See, e.g., United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013). Mr. Baskerville offers no such argument. He does not suggest the Government should have gathered IP logs or geo-fencing data, or fault the

Government for failing to do so. He describes, as a forensic matter, what the tracing evidence the Government did gather is technically capable of showing—testimony about the content and limits of specific evidence the jury will be asked to weigh on the question of identity, a fact plainly "of consequence" under Rule 401.

### B. Any Remaining Gaps in the First Opinion Go to Weight, Not Admissibility.

The Government's fallback argument—that the Report's citations (¶¶ 31, 37) are sparse—is, at most, a basis for cross-examination, not wholesale preclusion. Mr. Baskerville's stated basis for the First Opinion is his twenty-one years investigating cybercrime and cryptocurrency fraud, including direct experience with the type of blockchain-tracing software at issue, applied to his review of the Government's own discovery. That is a sufficient foundation under Rule 702; if the Government believes that foundation should be more fully explained, the proper vehicle is cross-examination or a limited *Daubert* hearing, not a pretrial order barring the entire opinion. *See McCullock*, 61 F.3d at 1044.

### C. The Second Opinion Is a Factual, Forensic Account of the Two Exploits, Not a Legal Conclusion.

Stripped of its framing, the substance of the Second Opinion is a technical narrative: which specific line of code was defective in each exploit—a missing reset of a reward-bonus variable in the *emergencyWithdraw()* function, Report ¶ 28, and a mistyped multiplier in the *swap()* function, Report ¶ 29—how each defect was exploited, and, critically, Mr. Baskerville's forensic conclusion that neither exploit involved a server-side intrusion, credential theft, or unauthorized modification of Uranium Finance's code. *Id.* ¶¶ 27, 30. That is a factual description of what did and did not occur at the level of network infrastructure, akin to a malware analyst testifying about how an intrusion technically occurred, or a forensic accountant testifying about how funds moved through a series of accounts—core digital-forensics subject matter, not a legal conclusion.

The defense recognizes, however, that ¶ 17 of the Report—"software code is absolute law"—and similar language elsewhere come close to, and in places cross into, argument about the legal meaning of "authorization" and "damage" under 18 U.S.C. § 1030, territory this Court has already addressed at the motion-to-dismiss stage. *See* Dkt. 18 at 9, 12. The defense does not intend to relitigate that ruling through Mr. Baskerville and does not oppose an order precluding him from testifying, in those or similar terms, that the exploits were "not without authorization" or caused no "damage" as a matter of law, or from using the phrase "code is law" or similar legal framing in front of the jury. What the defense opposes is the wholesale exclusion of Mr. Baskerville's underlying, non-legal technical testimony—the mechanics of the two coding defects and the absence of any server-side breach—which remains relevant to the jury's application of this Court's instructions to the facts, and to the defendant's state of mind, regardless of how the Court ultimately instructs the jury on the elements of § 1030.

### D. The Appropriate Remedy as to the Second Opinion Is Narrowing, Not Wholesale Preclusion.

Rule 702 does not require an all-or-nothing approach where, as here, the objectionable language is readily severable from the balance of a witness's testimony. The appropriate remedy for the isolated legal-conclusion language identified above is a limiting order directed at that specific language and at Report ¶ 17—not exclusion of the Second Opinion in its entirety, including the substantial portions of the Report (¶¶ 27-30, 32-39) that describe, in purely technical terms, how each vulnerability arose and was exploited.

### E. Mr. Baskerville Is Qualified to Describe the Technical Mechanics of the Two Exploits.

The Government's qualification argument (Mot. at 17-19) proves too much. It is true that Mr. Baskerville's report and CV do not describe him as a smart-contract auditor or a DeFi-protocol developer. But the technical account at the heart of the Second Opinion—how a coding defect was

exploited to drain funds from a system, and how to distinguish that from a network intrusion—sits squarely within the expertise of a twenty-one-year cyber-investigations specialist who led "complex federal investigations focused on electronic crimes, financial fraud, network intrusion response, and transnational cryptocurrency fraud," Report ¶ 4, and who directed a national digital-forensics laboratory responsible for "technical tool development, embedded device reverse engineering, and data recovery from severely damaged or encrypted systems," *id.* ¶ 5.

"Courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Distinguishing a code-level exploit of a publicly available function from a traditional network intrusion is core cyber-investigative subject matter, not the kind of specialized skill at issue in the qualification cases the Government cites—each of which involved a far wider gap between the expert's background and the specific opinion offered. *Compare Querub v. Hong Kong*, 649 F. App'x 55, 56-57 (2d Cir. 2016) (accountant familiar with one set of foreign accounting standards opining on a different board's standards), *and S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (structured-finance generalist opining on one specific, esoteric security), *with* Report ¶¶ 4-5 (cyber-investigator with two decades of network-intrusion and cryptocurrency-fraud experience opining on whether a specific cryptocurrency exploit involved a network intrusion).

### F. Reliance on Contemporaneous Technical Post-Mortems and Audits Is a Reliable Methodology.

The Report candidly discloses its methodology and the methodology's limits: because Uranium Finance folded in 2021 and its code repository was deprecated, Mr. Baskerville did not perform an independent de-compilation of the original source code, and instead relied on

"contemporaneous documentation produced at the time of the incidents," including "post-mortem summaries, third-party technical analyses, and forensic assessments published by blockchain security firms and investigators," together with "contemporaneous project communications." Report ¶ 12. That is not "internet research" of the kind found unreliable in other cases. *See*, *e.g.*, *Water Pollution Control Auth. of Norwalk v. Flowserve US Inc.,* 2018 U.S. Dist. LEXIS 52168, *61 (D. Conn. Mar. 28, 2018).

Rather, it is a forensic examiner's use of the type of contemporaneous documentary record that digital-forensics investigators routinely rely on to reconstruct historical technical events, particularly where the underlying system no longer exists to be examined directly. Mr. Baskerville does not simply repeat what other analysts concluded; he synthesizes that contemporaneous record—including the specific timeline of Uranium Finance's Version 2 rollout and the HyperJump security audit, Report ¶¶ 36-39—into his own forensic account of how each vulnerability arose and was exploited. Any residual concern about the completeness of that record is an appropriate subject for cross-examination, not preclusion.

### G. The Third Opinion Is a Proper, Experience-Based Opinion Within Mr. Baskerville's Established Field of Expertise.

The Government argues that because Mr. Baskerville's CV does not use the words "Tornado Cash" or "mixing service," he is unqualified to discuss them. Mot. at 21-22. But qualification under Rule 702 does not require that an expert's materials use the precise vocabulary of the opinion offered; it requires that the "area in which the witness has superior knowledge, education, experience, or skill" overlap with "the subject matter of the proffered testimony." *Tin Yat Chin*, 371 F.3d at 40. Cryptocurrency mixing services are not a discrete field of expertise separate from cryptocurrency tracing and cyber-fraud investigation—they are one of the standard categories that a career cryptocurrency-fraud investigator necessarily encounters and must

understand in order to perform the tracing work Mr. Baskerville has done throughout his career, including his leadership of investigations into "transnational cryptocurrency fraud." Report ¶ 4. That is a far closer fit than the qualification gaps in the Government's own authority. *Compare S.E.C. v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 407-13 (S.D.N.Y. 2019) (finance-and-economics generalist opining on a specific proprietary trading strategy), *and United States v. Menendez*, No. 23 Cr. 490 (SHS), 2025 WL 547794, at 5 (S.D.N.Y. Feb. 19, 2025) (anthropology professor with regional expertise opining on one narrow cultural practice), with Report ¶ 4 (cryptocurrency-fraud investigator opining on a standard cryptocurrency privacy technique).

Nor is the opinion "unsupported speculation." Mot. at 23. Rule 702 permits, and *Kumho Tire* expressly contemplates, opinions grounded in "extensive and specialized experience" rather than laboratory testing. *Kumho Tire*, 526 U.S. at 156. Mr. Baskerville's opinion that privacy-enhancing tools serve recognized, lawful functions—protecting large cryptocurrency holders from becoming targets for theft, phishing, and physical threats, Report ¶ 43—is precisely the kind of industry-practice testimony that a career financial-crimes investigator, who has spent two decades observing how both licit and illicit actors use these tools, is well positioned to offer.

**H. In the Alternative, the Court Should Hold a Daubert Hearing.**

The Government itself requests a *Daubert* hearing as alternative relief. Mot. at 23. The defense agrees that, to the extent the Court has any remaining concerns about the precise contours of Mr. Baskerville's qualifications or the basis for any of his three opinions after reviewing this opposition, a hearing—at which Mr. Baskerville can testify directly about his methodology and its application to the facts of this case—is the appropriate mechanism to resolve them, rather than resolving fact-intensive qualification and reliability disputes on a paper record alone.[3]

[3] The defense would request that if such a hearing is ordered, the defense be given sufficient notice to coordinate the witness's availability and travel.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to preclude the testimony of Steven Baskerville. To the extent the Court is inclined to grant any relief, the defense respectfully requests that any preclusion order be narrowly tailored to the specific legal-conclusion language identified in Part IV.D above, rather than the wholesale exclusion of Mr. Baskerville's testimony, and that the Court hold a *Daubert* hearing before ruling on any remaining disputes.

Dated: September 21, 2026

Respectfully Submitted,

*/s/ Shrey Sharma*
Shrey Sharma
Oberheiden P.C.
30 Wall Street, 8th Floor
New York, New York 10005
shrey@federal-lawyer.com
Telephone: (516) 851-7725
Fax: (972) 559-3365

**Counsel for Jonathan Spalletta**