OBERHEIDEN

ATTORNEYS
DR. NICK OBERHEIDEN
LYNETTE S. BYRD
P. COVARRUBIAS MEYER
ELLEN COMLEY
NICHOLAS JOHNSON
HON. BRIAN KUESTER
JONATHAN E. GOLDBERG
LINDA J. MCNAMARA
MICHELE RATCLIFFE
JOHN W. SELLERS
SHREY SHARMA
PAUL STRICKLAND
ALINA VENEZIANO

OF COUNSEL
HON. MIKE R. POMPEO
HON. TREY GOWDY

CONSULTANT
HON. KEVIN MCCARTHY

LOCAL COUNSEL
HON. S.A. MARSHALL
COREY STEINBERG
RICHARD T. SIMMONS
DAVID RABEN
ERICK CRUZ
MICHAEL A. RATAJ
BILL TUNKEY
KAMILLE DEAN
JOSEPH NASCIMENTO

**Shrey Sharma**
Direct Line: 516-851-7725
shrey@federal-lawyer.com

September 29, 2026

***VIA ECF***

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Jonathan Spalletta*, No. 26 Cr. 118 (JSR)

Dear Judge Rakoff:

Pursuant to Federal Rules of Evidence 401, 402, and 403, we respectfully request the Court to strike testimony concerning the amount of cryptocurrency allegedly lost by witness Jason Rodgers, his personal reasons for investing, and his personal reaction to those losses; instruct the jury to disregard that testimony and give the curative instruction proposed below; and preclude the Government from eliciting additional evidence of that nature unless it first establishes, outside the presence of the jury, that the particular evidence is relevant to a disputed issue at trial. The Court's observations during and at the close of the first day of trial identify precisely why this relief is warranted.

## Background

The Government opened by telling the jury that "[t]his case is about a heist, a theft of $50 million," taken "from victims all around the world." Tr. 24:11-13. The Government then elicited testimony from its first witness, Jason Rodgers, that his Uranium Finance investment had been "completely stolen" and that he had personally lost approximately $2.7 million, Tr. 54:1-8; that his investment goal "was always to try to buy a house" "[f]or my wife and two boys," Tr. 56:23-57:2; and that when he saw the Uranium liquidity pools drained, he "ran to the bathroom and threw up," Tr. 96:17-97:2.

The Court first questioned the relevance of this testimony at sidebar during Mr. Rodgers's direct examination, asking, "What's the relevance that this gentleman lost money?" and describing the house testimony as "another irrelevant statement that the government introduced without objection." Tr. 92:3-20. When the Government answered that the loss "goes to damage," the Court responded that "[h]is losing money is not damage to the integrity of the system." Tr. 92:6-8.

After the jury had been excused at the end of the day, the Court again *sua sponte* questioned the relevance of this evidence. The Court asked "why the fact that this witness lost any amount of money" was relevant and invited the Government to identify its "conceivable relevance." Tr. 117:12-18. The Court explained that Mr. Spalletta "would have been equally guilty or not guilty . . . if the loss had been zero dollars or $50 billion or anywhere in-between," and equally so "if, in fact, no one had lost a penny." Tr. 117:25-118:4. The Court further observed that the Government had not only asserted in its opening an overall loss of approximately $50 million, but was "now . . . introducing people who were the victims." Tr. 118:4-7. As to the testimony

that Mr. Rodgers invested to build a house for his wife and children, the Court stated that evidence concerning investors' life savings or money set aside for "precious purposes" was irrelevant. Tr. 118:11-22. The Court concluded that these matters were "not only irrelevant, they are prejudicial," and expressed concern about their confusing and prejudicial impact on the jury. Tr. 118:15-17, 119:4-6.

The Government responded that Count One requires proof of at least $5,000 in "loss." Tr. 119:18-20. The Court suggested that the element could be resolved by stipulation. Tr. 119:22-120:6. Defense counsel noted that "loss" under the CFAA has a more specific meaning than the economic loss of an investor. Tr. 120:7-15. The Government also invoked wire fraud, but the Court observed that the relevant question for that theory is whether the defendant obtained money or property through false representations, not the amount an individual investor happened to lose. Tr. 120:20-121:6. Finally, the Government argued that investors' inability to withdraw their funds was another form of damage to the system; the Court responded that it is "self-evident that if a system is forced to close, no one is going to be able to withdraw anything," and that the point accounted for "maybe 0.03 percent of this witness's testimony." Tr. 121:8-122:1.

<u>Discussion</u>

The testimony identified above should be stricken under Rules 401, 402, and 403. Irrelevant evidence is not admissible, Fed. R. Evid. 402, and even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time, Fed. R. Evid. 403. The amount of a particular investor's portfolio loss does not make it more or less likely that Mr. Spalletta intentionally caused unauthorized "damage" to a protected computer. As the Court observed, "It is, with very limited exceptions, irrelevant whether they lost money." Tr. 118:22-23. The same is true of the Government's wire fraud theory: "It doesn't matter who lost, it matters that he gained." Tr. 121:3-4.

Nor does an investor's personal reason for investing, intended use of the invested funds, or emotional reaction to the loss bear on any element of the charged offenses. That testimony instead invites the jury to decide the case based on the magnitude of financial harm and sympathy for individual investors. As the Court already recognized, those considerations create prejudice and confusion without materially advancing the jury's determination of the charged conduct.

The CFAA's separate concept of "loss" does not justify presenting the jury with the dollar value of cryptocurrency allegedly lost by individual investors. Section 1030(e)(11) defines "loss" as reasonable costs of responding to an offense, conducting a damage assessment, and restoring data, programs, systems, or information, together with revenue lost, costs incurred, or other consequential damages incurred because of an interruption of service. 18 U.S.C. § 1030(e)(11). The Second Circuit has accordingly recognized that lost revenue is cognizable only when connected to an interruption of service and that qualifying response costs concern investigating or remedying computer damage or service interruption. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 562-63 (2d Cir. 2006).

Thus, the value of cryptocurrency allegedly lost by an investor does not, without more, constitute CFAA "loss." To qualify, the Government would have to establish that the amount represents a reasonable cost of responding to the offense, assessing or restoring the affected computer system or data, or a revenue loss, incurred cost, or consequential damage resulting from an interruption of service. The Government elicited no such foundation for Mr. Rodgers's $2.7 million figure. To the contrary, Mr. Rodgers conceded on cross-examination that the figure simply reflected "how much I put in, and this was how much I got back out": "an estimate" that "didn't take into consideration asset prices at the time of the hack." Tr. 98:23-99:3. The fact that the alleged computer offense may have been the factual cause of an investor's economic loss does not, standing alone, transform that economic loss into statutory "loss"; the claimed loss must be of the kind specified in section 1030(e)(11).

The challenged evidence is particularly prejudicial because it reinforces the Government's opening theme that this case concerns a "heist" or theft of approximately $50 million. The charges require the jury to decide whether the Government has proved the elements of intentionally causing damage to a protected computer and money

laundering, not how much individual investors lost or what those losses meant to them. By pairing that narrative with evidence that Mr. Rodgers personally lost $2.7 million and intended to use his investment proceeds to buy a home for his wife and children, the Government invites the jury to resolve the case based on the magnitude and human consequences of investor losses rather than the statutory elements. That risk is particularly acute here because the testimony does not stand alone. It gives evidentiary force to the Government's opening characterization of the case as a $50 million "heist," creating a substantial danger that the jury will treat the magnitude of investor losses as proof that Mr. Spalletta committed the charged offenses.

The Court has already identified the concerns underlying Rules 401 and 403: this evidence is irrelevant to the issues the jury must decide and carries a substantial risk of prejudice and confusion. Striking the testimony, providing a curative instruction, and preventing repetition would address that prejudice now, before it becomes cumulative or incapable of cure.

A curative instruction should also make clear that the jury may not treat the amount of an investor's loss, or the personal consequences of that loss, as proof of guilt. The defense proposes the following:

> You have heard testimony concerning the amount of money that certain investors lost, the personal reasons for which they invested their money, and their personal reactions to the loss. I am instructing you to disregard that evidence. You may not consider the amount of an investor's financial loss, or the personal consequences of that loss, as evidence that Mr. Spalletta committed any of the offenses charged in this case.
>
> The question in this case is not whether any investor lost money or suffered financial hardship, and you should not decide this case on that basis.
>
> To the extent that "loss" is an issue you will be required to decide under Count One, "loss" has a specific legal meaning under the Computer Fraud and Abuse Act. I will instruct you on that meaning at the conclusion of the case. You should not assume that the amount of cryptocurrency or investment value lost by an investor constitutes "loss" for purposes of the statute.
>
> You must decide whether the Government has proved each element of the offenses charged beyond a reasonable doubt, based solely on the evidence relevant to those elements, as I will instruct you on them.

That instruction is especially appropriate because the jury has already heard both the Government's $50 million "heist" characterization and Mr. Rodgers's $2.7 million loss testimony.

The Court raised the issue on its own initiative twice on the first day of trial, first at sidebar during Mr. Rodgers's direct examination and again as soon as the jury was excused. Tr. 92:3-20, 117:12-18. The defense acknowledges that it did not lodge a contemporaneous objection when the loss and house testimony was first elicited, Tr. 117:15-16, although it did object on relevance grounds to the question that elicited Mr. Rodgers's physical reaction, Tr. 96:17-19. Nor does the defense's cross-examination on the basis for Mr. Rodgers's figure, Tr. 98:23-99:17, 113:12-20, alter the analysis. Once the figure was before the jury without foundation, the defense was entitled to test it, and that cross-examination showed that the figure was an unadjusted estimate with no connection to statutory "loss." Tr. 99:1-3.

The resulting prejudice can still be cured. A curative instruction and prospective ruling would prevent repetition of evidence the Court has already identified as irrelevant and prejudicial and would keep the trial focused on the elements the jury must decide.

<u>Requested Relief</u>

The defense respectfully requests that the Court: (1) strike Mr. Rodgers's testimony that he lost approximately $2.7 million, that he was investing to buy a house for his wife and children, and that he "ran to the bathroom and

threw up" upon seeing the liquidity pools drained, Tr. 54:1-8, 56:23-57:2, 96:20-97:2; (2) instruct the jury that it must disregard that testimony and may not consider an investor's personal financial loss, reasons for investing, or reactions to the loss as evidence of the defendant's guilt; and (3) preclude the Government from eliciting testimony concerning the amount of individual investors' financial losses, their life savings, intended uses of investment proceeds, family circumstances, emotional reactions, or similar victim-impact evidence unless the Government first establishes outside the jury's presence that the particular evidence is relevant to an element or other material issue in the case and is admissible under Rule 403.

The defense does not seek to prevent the Government from proving qualifying "loss" within the meaning of 18 U.S.C. § 1030(e)(11), or otherwise admissible evidence bearing on an element of a charged offense. Nor does the defense seek to preclude otherwise admissible evidence establishing the source or nature of property allegedly involved in the charged money-laundering transaction, or testimony about the functioning of the Uranium platform and investors' inability to withdraw funds, which the Government contends bears on damage. It asks only that the Government establish the proper evidentiary foundation before presenting additional large loss figures or victim-impact evidence to the jury. The requested relief is without prejudice to Mr. Spalletta seeking a mistrial if the Government continues to present additional irrelevant and prejudicial victim-loss evidence after the Court's ruling.

We thank the Court for its consideration of this request.

Respectfully submitted,

OBERHEIDEN, P.C.

/s/ Shrey Sharma
Shrey Sharma
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (516) 851-7725
shrey@federal-lawyer.com
*Counsel for Defendant Jonathan Spalletta*

cc: All counsel of record (via ECF)